Durfee, Judge,
delivered the opinion of the court:
This is an action for disability retirement benefits under the Career Compensation Act of 1949, 63 Stat. 802, 816-17, 37 TJ.S.C. § 272(a) (1952), as amended 10 U.S.C. §§1201, et. seg. (1958). The question to be resolved is whether or not the decision of the Air Force Board for Correction of Military Becords denying plaintiff’s application for a disability retirement rating was arbitrary, capricious, unsupported by evidence, or contrary to the laws and regulations relating to disability retirement.
In late 1950 and early 1951, plaintiff, an active duty officer serving in Japan, received several penicillin injections for an upper respiratory infection. In April 1951, plaintiff flew to Guam in conjunction with the performance of his duties. While in Guam plaintiff was admitted to a Naval Hospital in order to get relief from a severe case of hives and a penicillin reaction. The reaction was quite serious, as plaintiff remained in the hospital for more than a week.
Thereafter, plaintiff’s troubles steadily mounted. In May, 1951, while back in Tokyo, plaintiff was treated for a persistent sore throat. During the period that immediately *460 followed, plaintiff continued to experience episodes of difficulty in breathing, hoarseness, sore throat and loss of voice. Plaintiff testified that during this time he had recurrences of the symptoms which were “similar but not in degree” to the ones he experienced in connection with the attack he suffered in Guam in April. Although plaintiff required frequent medical treatment, he did not suffer an acute attack like the one he had in Guam. However, by his own admission, plaintiff was able to perform his military duties in substantially the same maimer as he had done prior to the attack that occurred while he was in Guam.
In January, 1962 plaintiff was transferred from Tokyo to Wright-Patterson Air Force Base in Ohio. While en-route by automobile to his new duty station during the latter part of February, 1952, plaintiff experienced symptoms similar to those on Guam in April, 1951, and suffered the first serious attack that approached the severity of the one he had in Guam. The treating physician’s diagnosis was “acute viral influenza and pneumonitis” and “probable acute exacerbation of chronic bronchial asthma.”
Shortly after reporting to Wright-Patterson AFB, Ohio, in the latter part of February 1952, a reduction in force directive was received at said base which affected a category of officers that included plaintiff. While it appears that plaintiff might have elected bo remain on active duty with the Air Force, he chose to be separated and released to inactive status. Apparently, in connection with plaintiff’s decision to request reléase from active duty, he made application for Government employment. A report of medical history dated April 10, 1952, and signed by Major Louis J. Hackett, relating to that application reflects plaintiff stated his then present health to be “Excellent based upon annual physical examination taken during Act [sic] 1950 pursuant to Air Force Begulation.” He furnished a history of “Asthma Tokyo type”, shortness of breath, a reaction to penicillin and treatment (within the past 5 years) for a “Penicillin reaction while on Guam being hospitalized for ten days in Navy Hospital.”
In connection with plaintiff’s request for release from active duty, he was given a physical examination on April 21, *461 1952 for the purpose of separation. The history portion of the medical report of that examination contains the following notation based upon information furnished by plaintiff: “Episode of asthmatic bronchitis in Tokyo 1950-51 with penicillin therapy April 1951, with severe penicillin sensitivity reaction following.” Underneath the heading “Summary of Defects and Diagnosis” appears the notation: “None. Denies all other serious illnesses, injuries, or operations.”
Medical records covering plaintiff’s illnesses and treatment during the period he was serving on active duty in Japan, or records relating to the attack he suffered on Guam were apparently not available to the medical officer who made the above examination in April, 1952. Nor apparently did plaintiff furnish any information concerning the attack he suffered in February, 1952 while enroute to Wright-Patterson. Further, plaintiff did not request a physical evaluation, disability, or any other kind of medical board for the purpose of determining whether he was fit to perform the duties commensurate with his grade and branch. Plaintiff testified that he was little aware of his true physical condition at the time of his separation examination and that he did not realize the seriousness of his condition until 1954. Plaintiff was released from active duty, not by reason of disability, on April 29, 1952. He was then assigned to a Deserve Unit where he continued to serve on an inactive status until his retirement in June, 1963.
After plaintiff was separated from active service his asthmatic condition became progressively worse. Between 1952 and 1954 he experienced two severe attacks which disabled him for about a week on each occasion. During the period 1954 to 1958 plaintiff continued to have an average of about two severe asthmatic attacks per year, and he lost considerable time from work during these years.[1] The attack suffered by plaintiff occurred with slightly greater frequency, and the recovery time from each of them increased in length over the preceding years. Finally in 1958, plaintiff’s condition, having worsened from asthma to chronic asthma *462 to emphysema (an incurable disease), forced his disability retirement as a Civil Service employee, and he was granted an annuity.
During this 1952-1958 period the following relevant events occurred:
(a) Plaintiff was declared unfit for retention in the Eeserves in 1954 due to disqualifying defects of asthma and prostatitis. Plaintiff was able to obtain a waiver for these defects, however, and was able to remain in the Eeserves.
(b) In 1955 and 1956 plaintiff executed Air Force Physical certificates, in which he indicated that he had no disease or disability which would disqualify him for full military duty.
(c) In 1958 plaintiff applied to the Veterans Administration for disability benefits. The VA denied the request on November 6, 1958, holding that plaintiff’s disability was not service-connected.
Immediately following plaintiff’s separation from civilian employment on December 3,1958, plaintiff applied to the Air Force Board for Correction of Military Eecords, requesting that his military records be changed to show that he was retired from the Air Force by reason of physical disability as of April 29, 1952. Although plaintiff indicated in his application that he did not desire to personally appear before the Board, he did indicate that he desired to have witnesses appear in person in support of his application. In support of that application, plaintiff submitted considerable documentary evidence concerning his physical health and illnesses, including (a) examination reports of the Guam attack; (b) the report of his separation physical; (c) Government medical records and physical examination reports relating to plaintiff’s commission as an officer in the Eeserves, and to attacks he suffered while employed as a civilian in the Federal Civil Service during the periods between 1952 and 1958; (d) VA records which included statements by civilian physicians; (e) written statements from officers and lay individuals who had personal knowledge of plaintiff’s physical appearance and condition before and after separation from active duty; (f) personnel records; and (g) other documentary evidence.
*463 The Correction Board upon advice from the Surgeon General found that the conditions which existed at the time of separation were not of sufficient severity to warrant a finding of permanent incapacity and disability retirement. Plaintiff was so advised on October 2, 1959. Plaintiff was not given a formal hearing before the Board on the ground that he had failed to submit sufficient evidence to establish a showing of “probable error or injustice.”
Plaintiff alleges that the action by the Correction Board in failing to correct his records to show service-connected disability at the time of retirement, was arbitrary and capricious. This court’s standard of review of the Correction Board’s findings is succinctly laid out in Stephens v. United States, 174 Ct. Cl. 365, 358 F. 2d 951 (1966), and reads as follows:
This court has held on many occasions that it has no power to review the decisions of the Secretary of one of the military departments or his authorized representatives in such a case unless the petitioner shows by cogent and clearly convincing evidence that such determinations are arbitrary, capricious, or not supported by substantial evidence. Furlong v. United States, 153 Ct. Cl. 557 (1961); Wales v. United States, 132 Ct. Cl. 765, 130 F. Supp. 900 (1955); Boland v. United States, 169 Ct. Cl. 145 (1965). * * *
We hold that plaintiff in the case at bar has not shown such determinations to be arbitrary and capricious or not supported by substantial evidence.
At the time plaintiff was given a physical examination on April 21, 1952, for the purpose of separation from the Air Force, he was suffering from intrinsic bronchial asthma which is a permanent condition, but not a consistent one, in that it is characterized by “ups and downs”, i.e., periods of remission and exacerbation. Apparently plaintiff’s condition was in a state of remission at the time of that examination.
During the course of plaintiff’s examination on April 21, 1952, he furnished a history of having suffered an episode of asthmatic bronchitis in Tokyo during 1950 and 1951, and being given penicillin therapy in April 1951, which resulted *464 in a severe penicillin sensitivity reaction. Despite that history, it should be noted and kept in mind that the record in this case does not disclose that official medical records and reports relating to illnesses suffered by, and treatments afforded plaintiff during 1950 and 1951, while he was on active duty in Japan, particularly the attack that occurred on Guam in April 1951, were available to the medical officer and authorities who examined and approved plaintiff for separation, or that plaintiff advised the examining medical officer or authority of the attack he suffered in late February 1952 while en route to Wright-Patterson AFB; that plaintiff admittedly did not realize the seriousness of his condition at the time of his separation examination and did not become aware of his true condition until about 1954; and that plaintiff’s bronchial asthma condition apparently was in a state of remission when he was examined for the purpose of separation. Considering the foregoing facts, it cannot be affirmatively found that there was sufficient evidence, by way of history furnished by plaintiff and official documentary medical history, available at the time of plaintiff’s separation examination to justify a determination by military medical authorities that plaintiff then was physically unfit to perform full military duties. Nor can it be found that Air Force medical authorities were remiss in their responsibilities, or wrong in their medical judgment, because they did not give a more thorough physical examination or insist that plaintiff appear before a physical evaluation board prior to his being separated from active duty with the Air Force; and any finding to the effect that if plaintiff had appeared before such a board prior to his separation, it would have determined that he was then physically unfit to perform the duties commensurate with his office, grade or rank, would be of a highly speculative nature and unsupported by the record.
It is obvious that there was a direct causal connection between the respiratory illnesses and “episode of asthmatic bronchitis” suffered by plaintiff in 1950 and 1951, while he was on active duty in Japan, including the adverse reaction he had to penicillin injections given to him in Japan which *465 resulted in tbe attack that occurred on Guam in April 1951, and plaintiff’s present physical condition. Plaintiff did not have any record of serious respiratory disturbance upon entering on active duty in 1948, and it cannot be seriously questioned that his disability is service-connected. Although this conclusion is contrary to the determination made by the Veterans Administration that plaintiff’s bronchial asthma was not service-connected, it should be kept in mind that the controlling question for determination in this case is not whether the decision of the Veterans Administration was proper, nor whether plaintiff is now physically disabled from discharging full military duties, but rather whether his physical condition was such at the time he was separated from the Air Force that he was then unfit to perform the duties of his grade or rank because of a service-connected disability. On the basis of the entire record, the latter question must be answered in the negative.
It would appear that the medical and other supporting evidence submitted to the Air Force Board for Correction of Military Records was of such a substantial nature that the Board might well have held a formal hearing before reaching a decision with respect to plaintiff’s application requesting that his military records be changed. But the question of holding a hearing was a matter properly within the discretionary judgment of the Board upon which reasonable minds might differ;[2] and the record in this case will not support a finding that the Board’s administrative decision not to hold a hearing clearly constituted an abuse of discretion.
On the basis of the evidence submitted to the Secretary of the Air Force at the time of plaintiff’s release from active duty on April 29, 1952, the evidence submitted to the Air Force Board for Correction of Military Records, and the evidence of record as a whole, it cannot be found that either the action of the Secretary of the Air Force in releasing plaintiff from active duty “not by reason of physical disability,” or the decision of the Correction Board not to hold *466 a formal hearing for the purpose of giving plaintiff an opportunity to try to establish his disability, or the action of the Board in refusing to change plaintiff’s military records to reflect that he was retired because of a service-connected disability, was arbitrary, capricious or not supported by substantial evidence.
Plaintiff is not entitled to recover, and the petition is dismissed.
BINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Franklin M. Stone, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff was born on June 21,1903, and is a citizen of the United States. He served in an enlisted status in the United States Army from April 13, 1919 to June 17, 1922, and on active duty as a commissioned officer in the United States Air Force from June 29,1942 to August 9, 1946, and from October 12, 1948 to April 29, 1952. He also served in an inactive duty status in the United States Air Force Reserves from August 10, 1946 to August 11, 1948, and from April 30,1952, until the filing of this suit on April 13, 1962, and thereafter.[1] At the time of the filing of this action, plaintiff held the grade of lieutenant colonel in the Air Force Reserves, and was assigned serial number AO 480 056.
2. On October 12, 1948, plaintiff was given a physical examination at the General Dispensary, Chicago, Illinois, for the purpose of entering on active duty with the Air Force. The medical history portion of the report of that examination reflects that plaintiff’s last physical examination had been made in April 1946 at Fort Sheridan, Illinois, at which time he was found “qualified for general military service without *467 waiver.” The examination report shows that plaintiff gave no history of “hay fever, asthma, migraine or sinusitis;” that he was normal in all respects at that time; and that he was found to be “qualified and acceptable for extended active duty on a general military service status.”
3. On October 12, 1948, plaintiff entered on extended active duty with the Air Force and was assigned to duty as the Commander, 24th District Office, Office of Special Investigations. Thereafter, in November of 1949, he was transferred to Tokyo, Japan, and assigned to duty as Chief of the Criminal Investigative Division, Far East Forces. Following the outbreak of the Korean conflict in 1950, he was reassigned as Chief of the Contract Audit Division of the Far East Forces sometime in June or July 1950. At that time, plaintiff had no problems of any consequence with his health and appeared quite normal.
4. (a) From the latter part of December 1950 to on or about April 13,1951, plaintiff was treated at a military dispensary in Tokyo, Japan, on several occasions for an upper respiratory infection that was believed to be a “common cold,” and he received medication including a number of penicillin injections. On April 15, 1951, plaintiff flew from Japan to Guam in conjunction with the performance of his duties, and on April 18,1951, he was admitted to a United States Naval medical facility on Guam, complaining of itching, hives all over his body, and swelling of his hands and feet during the previous twenty-four hour period. Plaintiff’s condition was diagnosed as “URTICARIA, generalized (due to penicillin) #2430.” A transcript of plaintiff’s medical history covering the period of his hospitalization from April 18 to April 28, 1951 (marked Confidential) reads in pertinent part:
PH: * * * Patient developed an upper respiratory infection 10 days ago with mild chills and fever. Seen at dispensary on 9 and 10 April and received penicillin injections (PBO). Also had injection of streptomycin and some “sulfa” drug to take by mouth. Continued to feel poor despite treatment. Remained in quarters 4 days. Patient flew from Japan to Guam arriving Monday, 16 April about noon. Continued to feel poorly. Tuesday night developed generalized *468 urticaria. This morning at 0900 turned in to dispensary where he received one injection of adrenalin without relief. Given benadryl 50 mgm which he took at 1130, 1530 and 1830 respectively. Applied calamine lotion locally, had some improvement but developed nausea, vomiting, fever. Has swelling of feet and hands at this time.
$ $ ‡ ‡
Habits: Benign; Family History: No history of allergy. * * * General: Has not enjoyed good health since January. Head: Has had mild headaches. ENT: Frequent respiratory infections. Had laryngitis in January. Bespiratory: Some dyspnea. Slight cough. Cardiac: Has had paroxysmal dyspnea and arrthymia [sic] several occasions in past 3 months. * * *
FT: General: A well nourished and developed, moderately obese white male who appears acutely ill. Skin: Giant urticarial lesions on arms, legs, buttocks, axillae and back. Some are excoriated. Nodes: No local or general adenopathy. Head: Negative. Eyes: Moderate conjunctivitis. Ears: Canals and drums clear. Throat: Pharyngitis on ant. pillars. Lungs: Clear to P&A. Heart: Begular rhythm. No murmurs, not enlarged. Abdomen: No masses or tenderness. * * * Extremities: Swelling and edema of hands and feet. Beflexes: Physiological. Impression : Urticaria due to penicillin reaction. _
_ -L-19-51: Chest X-ray reported negative this date.
4-19-51: Boutine laboratory work including CSC, Hahn, and sedimentation rate all normal. Admission urinalysis showed 50 mgm. albumin. Albuminuria probably due to fever.
4-19-51: Dermatology Beport: Typical penicillin reaction.
# if:
4-20-51: Patient shows some improvement today. Has intolerance to benedryl and have changed to pyriben-zarine. Still has marked giant urticaria on skin.
4-21-51: Patient today is complaining of shortness of breath and tachycardia. He got up this morning and shaved and it may be that the exertion has over tired him. Examination of the heart is normal except for distant heart sounds.
4-23-51: All skin lesions clear. Patient is much improved. Started on soft diet.
*469 4-25-51: Started on regular diet and allowed to be u.p and about. Patient is afebrile and asymptomatic.
4-27-51: Patient is afebrile. His only complaints are mild soreness of tbroat and hoarseness. As noted in admission history patient has had recurrent upper respiratory infection and malaise since January. Examination of the pharynx reveals a mild pharyngitis with a small vesicular eruption on the left anterior tonsillar pillar. There is also a mild conjunctivitis. Admission blood count revealed a normal WBC 8,700 despite fever. I believe this patient’s original infection was of viral etiology and might be described as a herpangitis which is still not completely clear.
4-28-51: To duty.
(b) On April 28, 1951, plaintiff was discharged from the Naval medical facility on Guam and released to duty. Thereafter, he returned to his duty station in Tokyo, Japan.
5. (a) On May 14,1951, plaintiff reported to the Far East Air Force dispensary in Tokyo, and the clinical records reflect that an ear, nose, and throat consultation was requested because plaintiff complained of a chronic sore throat of about 5 months duration and that he was “resistant to Rx given him.” A consultation report dated May 21, 1951, reads in pertinent part:
* * * Pt. complains of lack of vitality, listlessness, enervation, chills, hoarseness and sore throat. Has had these complaints since Nov. 50. Been treated a number of times a antibiotic but it doesn’t do much good. Says throat gets sore rapidly and will stay so for several hours then clear up. The ache is located in the hypo-pharynx — it is not a pain. “Things feel like they are going down crosswise when I swallow.” This comes and goes also.
The ears and nose are normal.Tonsils are very small and embedded. There is no evidence of acute or chronic infection. After anesthetizing the pharynx a pantraine, the hypopharynx and larynx can be seen. They are normal. The sinuses transilluminate well. X-rays of sinuses done today. Impress: Believe symptoms are largely functional — would like to see again on 24 May 1957 for clearance. Recomm — medical consult also.
Plaintiff was given an X-ray examination on May 24, 1951, and a radiographic report indicated an impression of “Ca-tarrhal rhinitis without evidence of infection in any of the *470 sinuses,” and stated that “These patients do much better in a high, dry climate.”
(b) Plaintiff testified that following the above-mentioned examinations, he continued to experience episodes of difficulty in breathing, hoarseness, sore throat, and loss of voice, throughout the remainder of his tour of duty which terminated in January of 1952, with his return to the United States; and that during this time he had recurrences of the symptoms which were “similar but not in degree” to the ones he experienced in connection with the attack he suffered on Guam in April 1951; that although he required frequent medical treatment, he did not suffer an acute attack like the one he had on Guam; and that he performed his military duties involving auditing work in substantially the same manner as he had done prior to the attack that occurred while he was on Guam. No official military medical records were introduced in evidence relating to plaintiff’s physical condition, i.e., physical examinations, illness suffered by plaintiff, or treatments affordecThim, from the time he was examined in Tokyo in May 1951, until he was given a separation examination on April 21, 1952, except a request dated December 26, 1951, from the 1st Medical Squadron FEAF Base, that plaintiff'be examined by the Opthomology Clinic which reads in pertinent part:
Excess lachrymation and redness with pain both eyes duration of six (6) weeks. Getting worse. No relation to new glasses; he had the trouble before then. Also feels generalized myalgia. The periorbital region on both sides is reddened and there seems to be a welt on the left lower lid. Looks like an allergic phenomen. Infectious element is not obvious, at least. Has been on phribenzamine for his asthma, but noticed no change in status of eyes.
6. In January 1952, plaintiff was transferred from Tokyo, Japan to Wright-Patterson Air Force Base (AFB), Dayton, Ohio. While enroute by automobile to his new duty station during the latter part of February 1952, plaintiff experienced symptoms similar to those on Guam in April 1951, and suffered the first serious attack that approached the severity of the one he had at that time. Plaintiff was treated for this *471 attack by Dr. William O. L. Seabaugh, Cape Girardeau, Missouri, wbo, under date of October 20,1958, wrote a letter “To Whom it May Concern”, which reads as follows:
This is to certify that on February 24,1952,1 treated the above-named at the home of his sister, Mrs. Oscar Findley, 28 North Park, Cape Girardeau, Missouri where he was visiting. Mr. Hoffman gave a history of having had a temperature of 104 degrees the night preceding, while traveling to Cape Girardeau, Missouri. I saw Mr. Hoffman at 11:00 a.m., February 24, 1952, and found that he had acute pulmonary infection, probably viral in nature. However, at the time he had rather marked musical rales in both lung fields and was very dyspneic. He gave a history of having “asthma” and on this basis, I gave him some adrenalin by injection which relieved the dyspnea. He was also given analgesics and Aureomycin capsules. When again seen at about 8:00 p.m., February 25, 1952, the patient had improved considerably and his temperature was down to almost normal. By February 26, 1952, Mr. Hoffman was able to travel and departed for his next post of duty.
My diagnosis of this man’s condition was: 1.) Acute viral influenza and pneumonitis, and 2.) Probable acute exacerbation of chronic bronchial asthma.
7. Shortly after reporting to Wright-Patterson AFB, Ohio, in the latter part of February 1952, a reduction in force directive was received at said Base which affected a category of officers that included plaintiff. While it appears that plaintiff might have elected to remain on active duty with the Air Force, he chose to be separated and released to inactive status. Apparently, in connection with plaintiff’s decision to request release from active duty, he made application for Government employment. A report of medical history dated April 10,1952, and signed by Major Louis J. Hackett, relating to that application reflects plaintiff stated his then present health to be “Excellent based upon annual physical examination taken during Act [sic] 1950 pursuant to Air Force Begulation”. He furnished a history of “Asthma Tokyo type”, shortness of breath, a reaction to penicillin and treatment (within the past 5 years) for a “Penicillin reaction while on Guam being hospitalized for ten days in Navy Hospital.”
*472 8. (a) In connection with plaintiff’s request for release from active duty with the Air Force, he was given a physical examination on April 21, 1952, preliminary to, and for the purpose of, separation. The history portion of the medical report of that examination contains the following notation based upon information apparently furnished by plaintiff: “Episode of asthmatic bronchitis in Tokyo 1950-51 with penicillin therapy April 1951, with severe penicillin sensitivity reaction following.” Underneath the heading “Summary of Defects and Diagnosis” appears the notation: “None. Denies all other serious illnesses, injuries or operations.” The medical officer who examined plaintiff found plaintiff qualified for “Separation” and did not list any disqualifying defects.
(b) It does not appear that medical records covering plaintiff’s illnesses and treatment during the period he was serving on active duty in Japan, or records relating to the attack he suffered on Guam in April 1951, were available to the medical officer who made the above-mentioned examination of plaintiff on April 21,1952. Nor does it appear that plaintiff furnished any information concerning the attack he suffered in February 1952, while enroute to Wright-Patterson Air Force Base, which resulted in treatment by Dr. Seabaugh during the period from February 24 to February 26, 1952. (See finding 6, supra.)
(c) Plaintiff testified at the trial that the physical examination afforded him on April 21,1952, required only a short time and seemed to him to be “rather cursory”, but there is no evidence that at the time of the examination he expressed any objection thereto. Plaintiff did not request a physical evaluation, disability, or any other kind of medical board for the purpose of determining whether he was fit to perform the duties commensurate with his grade and branch of service, nor was it suggested to him by Air Force medical officers or officials that he appear before such a board prior to his separation. Plaintiff testified that he was “little aware” of his true physical condition at the time of his separation examination and that he did not realize the seriousness of his condition until 1954.
*473 9. On April 29, 1952, plaintiff, then a lieutenant colonel, was released from active duty and honorably separated from the active service, by reason of convenience of the government, pursuant to the provisions of Paragraph 57, Special Orders 92, Headquarters, Wright-Patterson AFB, issued under the authority of Section 515, Public Law 351, 80th Congress, Officer Personnel Act of 1947, as implemented by Air Force Eegulation 35-59 teletype message, Headquarters, United States Air Force, AFPMP-4, 42516, dated March 1, 1952. Plaintiff was assigned to an Air Force Eeserve unit and he continued to serve in the Eeserves, in an inactive duty status, until his retirement on June 30, 1963. (See footnote 1, supra.) His service in the Eeserves was largely sedentary and consisted of attending weekly meetings of his reserve units or taking correspondence courses. He did not serve on active duty at any time subsequent to his separation from active service on April 29,1952.
10. During the period from approximately July 1, 1952 to December 1958, plaintiff was employed as a civil service employee by the Federal Government. From on or about July 1, 1952 to July 1, 1954, plaintiff was employed as an auditor in grade GS-14 by the Inspector General of Army Ordnance. From on or about July 1, 1954 until about June 29, 1958, he was employed in grade GS-13 as a supervising auditor in the audit office of the United States Navy at San Francisco, California. On June 29, 1958, he was appointed to the position of Financial Analyst in grade GS-12, and he served as chief civilian accountant with the Department of the Air Force at Travis Air Force Base, California, from that date until his retirement from Federal service, by reason of physical disability, on or about December 3,1958, by which date he had been demoted to grade GS-11. Subsequent to his retirement from the Federal Government, plaintiff engaged in the practice of certified public accountancy, and in March of 1963, he was employed as a junior accountant by the State of California.
11. After plaintiff was separated from active duty military service on April 29,1952, his asthmatic condition became progressively worse. Between 1952 and 1954, he experienced *474 two severe attacks which disabled him for “a week or so” on each occasion. During the period from 1954 to 1958, plaintiff continued to have an average of about two severe asthmatic attacks per year and he lost considerable time from work during these years. The attacks suffered by plaintiff occurred with slightly greater frequency and the recovery time from each of them increased in length over the preceding years. In this regard, plaintiff had recurring symptoms of fever, chills, hoarseness, sore throat and difficulty with breathing, similar to those he experienced on Guam in 1951, and he received various medications for his condition.
12. On December 29, 1953, plaintiff executed a certificate in connection with his Reserve inactive duty wherein he certified that to the best of his knowledge, he had no defect, disease or disability which would disqualify him for full military duty.
13. On August 2,1954, plaintiff underwent a physical examination at Parks Air Force Base, California, for the purpose of determining his “Physical Fitness.” The medical report of that examination contains the following pertinent notations relating to plaintiff’s medical history: “Asthma, hayfever, seasonal 1951 to 1953. Uses atomizer frequently. Shortness of breath associated with asthma. Penicillin reaction in 1951.”
Under the heading of “Summary of Defects and Diagnosis,” it was stated that plaintiff had “Prostatitis, chronic, with moderate hypertrophy, cause undetermined” and that he had a “History of asthma, still requiring medication.” As a result of the examination, plaintiff was found by the examining physician to be unfit for general military service, due to disqualifying defects of asthma and prostatitis. On September 22,1954, the Office of the Surgeon, Headquarters, 4th Air Force, Hamilton Air Force Base, California, certified a determination that plaintiff was “physically qualified for general military service”, with a waiver for the prostatitis and asthma. It appears that such waiver was granted in order to permit plaintiff to continue on inactive duty in the Reserves, thereby adding points towards his Title III retirement.
*475 14. On June 30, 1955, plaintiff executed a certificate in connection with his Eeserve annual physical in which he certified that to the best of his knowledge he did not have any medical defect, disease or disability which would disqualify him for full military duty. “Except asthma as noted on physical examination taken in August 1954.”
15. On September 18,1956, plaintiff executed an Air Force Eeserve Annual Physical Certificate in which he certified that to the best of his knowledge he did not have any medical defect, disease or disability which would disqualify him for full military duty.
16. On or about February 18, 1958, plaintiff suffered an acute asthmatic attack and was hospitalized at Sheppard Air Force Base, Texas, from that date until February 21, 1958. With respect to that attack, the following pertinent statements are contained in a memorandum described as a “Narrative Summary,” dated February 21, 1958, which was prepared on the basis of a transcription of notations made in a daily diary apparently maintained on an intermittent basis by plaintiff from 1950 to 1958. Said summary, together with other documentary material, was submitted to the Air Force Board for Correction of Military Eecords by plaintiff in support of his application, dated December 12,1958, requesting a change in his military records. (See finding 23, infra.)
History': This 54-year-old white male was admitted to Sheppard USAF Hospital, for extreme shortness of breath. The patient has had a history of bronchial asthma since 1951. The patient had several bouts of shortness of breath in the past with relief with isuprel atomizer. The patient states that he has used the atomizer quite frequently and on this occasion received no relief from its use.
Physical Examination: Eevealed an over-weight white male in acute respiratory distress. He was alert and cooperative. The ears were clear. The nares revealed congestion with swollen turbinates, and a post-nasal drainage was present. The respirations were rapid and shallow with wheezing sounds audible throughout the room. The lungs were clear to percussion. There were inspiratory rales bilaterally with expiratory wheezes with a prolonged expiratory phase. The PMI was not palpable. The heart was not enlarged to percussion. *476 The pulse rate was regular at 90 per minute. The heart sounds were full and regular, no murmurs were heard. The remainder of the physical examination was within normal limits.
Laboratory Findings: The admitting complete blood count, urinalysis and serology were negative. Chest x-ray was negative.
Gowrse in the Hospital: The patient was placed on ephedrine, phenobarbital, and was given 0.25 gms of IV aminophyllme without obtaining any marked relief. The patient continued to have more respiratory distress. An attempt to give the patient nasal oxygen was done, * * * the patient’s breathing then became better, and he was started on 10 units of ACTH every six hours. The patient was also given aminophyllme suppositories gm every 12 hours. The next day the patient had a rise in temperature, with increased inspiratory rales in the lungs, and was therefore started on achromycin, with a sputum culture which showed beta hemolytic Strep. The temperature became normal after one day of this therapy and breathing improved markedly. The patient was then dismissed on ephedrine 25 mgs t.i.d., chlortrimeton 4 mgs t.i.d. and achromycin 250 mgs q.i.d. for four days. The patient was told not to use his atomizer for at least two to three months so that it could regain its effectiveness.
Diagnosis: Dg. #1. 2411. Asthma, perennial, allergen unknown.
Dg. #2. 4190. Bronchitis, acute, organism unknown.
17. On September 8, 1958, plaintiff took his quadrennial reserve physical examination at Mather Air Force Base, California. The medical examination report shows that abnormalities were found relating to plaintiff’s nose, lungs, and chest, and the report contains the following pertinent notations : “Nasal mucosa somewhat reddened and raw in appearance with a small amount of pearly grayish exudate. * * * There is a moderate increase in the antero-posterior diameter of the thorax. There are scattered fine sibiliant ronchi over both lung fields during both inspiration and expiration.” Under “significant or interval history,” the following was stated:
$ $ $ $ $
Had a sinus drained at Tokyo Army Hospital in May 1951 without complications or improvement of asthma *477 for which examinee understands the procedure was undertaken to alleviate. Asthma since spring of 1951 when on Guam. At first he had severe attacks only about once a year, increasing in frequency to four (4) in the past year. He also claims to have ielt continuously short of breath since May 1951, has a persistent cough productive of yellow sputum at sometimes, dry at others. He has been hoarse off and on since spring of 1951. He occasionally notes a retrosternal pain, insidious in onset and lasting about 3-4 hours without weakness, nausea or sweating. He is under civilian care for asthma. No F. H. allergies. No history of childhood croupe, eczema or hives. No food intolerance. He has been skin tested, he states, to 250 items and has shown no evidence of hypersensitivity to any except pineapple, which he almost never eats. He is seeking disability compensation for his bronchial asthma from some Federal agency. He had anaphylactoid reaction to penicillin with shock, dyspnea, hives and itching in spring of 1951. To this he attributes significance in his subsequent bronchial asthma. He was hospitalized 10 days for this. * * *
The examining physician’s diagnosis of plaintiff’s condition was “Bronchial Asthma, Chronic.”
18. (a) Subsequent to plaintiff’s appointment to the position of financial analyst with the Air Force of Travis Air Force Base on June 29,1958 (see finding 10, supra), he was given a physical examination on December 3, 1958. The medical report of that examination discloses that plaintiff was found abnormal in the following respects: “Bronchial asthma, recurrent, severe, incapacitating, subject to exacerbation and remissions. Historically documented.” The examining physician stated that in his opinion plaintiff was physically capable of performing only light physical exertion and was not physically qualified to perform the duties of the position then held by him.
(b) A Statement of the Employee’s Superior Officer, dated December 3, 1958, and signed by Sol Oswald, Management Analysis Division, Headquarters, USAF, Travis Air Force Base, California, reads as follows:
Due to Mr. Floyd Hoffman’s physical disability brought on by recurrent bronchial asthma and emphysema, this individual would not be an effective employee.
*478 Mr. Hoffman, has been absent on sick leave for a total of approximately 190 hours since 2 July 1958. This amount of absence is considered in excess of normal and indicates that this employee is incapable of performing his assigned duties. This is confirmed by Dr. Spiro, Flight Surgeon, in Certificate of Medical Examination (Std Form 78) #5468, accomplished on 3 December 1958 at Travis Air Force Base Hospital.
It is not believed that the employee is able to perform the work of some other position, and no other position has been offered to him.
It is the belief of the undersigned that Mr. Hoffman’s disability is not the result of vicious habits, intemperance, or willful misconduct.
(c) As a result of the above examination and statement, plaintiff was retired from his employment as a civilian employee of the Air Force for physical disability, and he was receiving an annuity of $266 per month from the Federal Government at the time of the trial of this case.
19. Since at least as early as March 1957, plaintiff has been under the care of various physicians engaged in private practice. Dr. C. Alvin Dougan, Napa, California, examined plaintiff on December 12,1957, and, thereafter, referred him to Dr. Francis L. Chamberlain, San Francisco, California, who directed a letter to Dr. Dougan under date of January 13, 1958, which reads in pertinent part:
This 54 year old accountant was referred for a question of any cardiac component to his dyspnea and wheezing. According to his history there was nothing to suggest pulmonary disease or respiratory symptoms until he arrived in Tokyo in 1949. During the next year and a half he had several colds and sore throats and was treated with penicillin a number of times. He noticed wheezing shortly after this. In April 1951, following another penicillin injection for a “cold” he developed about 10 days after the injection generalized urticaria and fever with joint aches, treated at the naval hospital in Guam as a penicillin reaction and subsiding upper respiratory infection. Since this time he complains of over all fatigue, lack of ambition and motivation, shortness of breath, especially on effort, but worse at night, associated with a moderate amount of wheezing, plus continued sputum in the morning and occasional hoarse *479 ness. About every three to six months since 1952 he has had sudden attacks of fever as high as 104° with variable amounts of dyspnea, occasional vomiting and with breathlessness and wheezing. He says he received adrenalin during some of these attacks with moderate relief. His recurrent breathlessness and wheezing have persisted to the present time. He has had rather striking relief with Tedral as well as with a “Tucker” inhaler. There is no history of coronary pain or of dependent edema or of arrhythmia.
The important findings on physical examination were his reasonably healthy, rather heavy set appearance with slight cyanosis of the nails, normal retinal arterioles, a large emphysematous chest with diminished breath sounds and diffuse expiratory wheezes throughout the lung fields typical of bronchiolar spasm. The heart sounds were of good quality without murmurs and the aortic exceeded the pulmonary second sounds. The blood pressure varied from 140/85 to 115/75. The prostate was slightly enlarged with normal consistency. The abdomen was negative, deep reflexes normally active, the foot pulsations normal, the neck veins not distended and there was no dependent edema. Fluoroscopically the heart itself appeared well within the normal range of size and shape with the lung fields clear and the diaphragms low. There was no evidence of heart enlargement. By orthodiagraphy the heart measurements were normal with the transverse heart measuring 10.9 cm. and the transverse chest 30 cm. The vital capacity was 82% of normal at 3,600 cc. This was repeated two weeks later after a therapeutic trial of diuretics and was identical at 3,600 cc. The electrocardiogram, a copy of which is enclosed, is well within the normal range. His urinalysis was negative, hemoglobin 15.5 grams with 13,000 WBC and a normal differential including 60% polys (2% stabs.) 34% lymphocytes, 2% monocytes, 3% eosinophiles and 1% basophiles. The Wintrobe sedimentation rate was normal at 6 mm. in an hour and the packed cell volume a little high at 50%. His family history was good with respect to cardiovascular disease and life expectancy. His living habits have been exemplary.
He was given a trial period for two weeks of a potent oral diuretic (Chlorothiazide) and a list of observations to make about his weight, breathlessness, wheezing, etc. on days when he took the above-mentioned Chlorothia-zide or on days when he took large doses of aminophyllin *480 (Cardalin) by mouth. These medications had no definite effect on his breathlessness, wheezing or weight.
I conclude, then, that this man has no evidence of heart disease but that his findings are typical of bronchial asthma with chronic bronchitis and emphysema and with the typical recurrent episodes of severe respiratory embarrassment when he has upper respiratory infections. I advised consultation with an allergist in hopes of the chance (which I admit was not awfully good) of finding something which might help reverse his asthma. * * *
20. Under date of August 2, 1958, Dr. C. Alvin Dougan, (mentioned in finding 19, sufra), submitted a medical report “To Whom It May Concern”, which reads as follows:
The above named patient was first studied and given treatment for his severe and disabling condition.
This patient’s documented history dates his disabling dyspnea, productive cough, weakness, etc., from his near fatal anaphylactic reaction while hospitalized in service.
Unable to do more than relieve the Colonel’s symptoms thru weeks of detailed study and intensive therapy, consultation was requested and the patient referred to Dr. Francis Chamberlain of the University of California.
It was Dr. Chamberlain’s recommendation that benefit if any should be sought from an allergist as there was no evidence of heart disease but that the findings were typical of bronchial asthma, with chronic bronchitis and emphysema.
Subsequent to all the above work the patient continues with his disability with typical recurring episodes of severe respiratory embarrassment, characterized by over all fatigue, lack of ambition and motivation, shortness of breath, especially an effort, but worse at night and associated with wheezing, productive cough, hoarseness, occasionally vomiting and extreme breathlessness.
We consider Colonel Floyd Hoffman’s status crippling and recommend unequivocally disability retirement.
21. (a) Under date of August 18, 1958, Dr. William K. Nesbitt, San Francisco, California, submitted a medical report “To Whom it May Concern” which reads as follows:
Mr. Floyd Hoffman has been treated by me intermittently since March, 1957 for asthma. According to his history which is sustained by photostatic copies of his medical records, he developed wheezing and extreme shortness of breath following some injections of penicil *481 lin while on duty with the U.S. Air Force on Guam, April, 1951. There was no history of asthma previous to tins episode, and there has been a continuing history of recurrent asthma since then.
On March 23, 1957, he was first seen at home with a severe attack of bronchial asthma, which had at that time totally incapacitated him.
He was seen on several occasions since then for the same condition.
Diagnosis: Bronchial asthma, recurrent, severe.
Prognosis: The patient will probably suffer from repeated attacks of bronchial asthma the rest of his life.
(b) Dr. Nesbitt also submitted a similar report, dated December 5,1958, which reads as follows:
Mr. Hoffman has been under my care for recurrence of asthma since March 23,1957. Physical signs consist of emphysematous configuration of the chest, squeaks, wheezes and musical rales on auscultation during attacks. These attacks cause a high degree of disability, and because of the increasing frequency, interfere with his being of useful and efficient service in his present position.
According to our documented history, this disability has become progressively worse since 1951. There is no indication that this disability is due to vicious habits, intemperance, or willful misconduct.
22. (a) It appears that sometime prior to plaintiff’s retirement from his last civilian employment in the Federal service in December 1958, because of physical disability, he applied to the Veterans Administration for disability benefits. A letter directed to plaintiff by the Adjudication Officer of the Veterans Administration, Begional Office, San Francisco, California, under date of November 6, 1958, reads as follows:
Your claim for disability benefits has been reconsidered on the basis of evidence recently submitted to us by your service representative, the American Legion, together with all other evidence pertaining to your claim in this office.
Service connection for your bronchial asthma has been again denied. Y our claim for disability benefits has been again disallowed.
The American Legion appeared in your behalf when your claim was considered.
*482 Your attention is invited to attached Notice of Eight to Appeal.
(b) It does not appear from the record that plaintiff appealed said decision of the Veterans Administration.
(c) No physical examination in connection with the above application was afforded plaintiff or requested by the Veterans Administration.
23. Plaintiff submitted an application, dated December 12, 1958, to the Air Force Board for Correction of Military Eecords, requesting that his military records be changed to show that he was retired from the Air Force by reason of physical disability as of April 29, 1952. Although plaintiff indicated in his application that he did not desire to personally appear before the Board, he did indicate that he desired to have witnesses appear in person in support of his application. In support of that application, plaintiff submitted considerable documentary evidence concerning his physical health and illnesses both prior and subsequent to his release from the Air Force on April 29, 1952, including, inter alia, (a) official military medical records and examination reports relating to his physical condition while in Japan and to the attack he suffered on Guam; (b) the report of physical examination made of plaintiff on April 21, 1952, incident to his release from active duty on April 29, 1952; (c) government medical records and physical examination reports relating to plaintiff’s commission as an officer in the Eeserves and to attacks he suffered while employed as a civilian in the Federal civil service during the period between 1952 and 1958; (d) Veterans Administration records which included statements submitted by civilian physicians and medical consultants, including Dr. William O. L. Seabaugh (see finding 6, mfra), Dr. Nesbitt (see finding 21(a), supra), and Dr. Dougan (see findings 19 [2] and 20, supra); (e) written statements from officers and lay individuals who had personal knowledge of plaintiff’s physical appearance and condition before and after his separation from active duty military service (see finding 24, infra); (f) personnel records *483 covering tbe period from January 1, 1950 to tbe date of plaintiff’s application for correction of bis military records; (g) verbatim transcriptions from plaintiff’s daily logs and personal records covering tbe period from 1950 to 1958 (see finding 16, supra); and (b) other allied documentary evidence.
24. As noted in finding 23(e), supra, written statements which bad been obtained from a number of officers and individuals who either knew plaintiff before bis release from active military duty, or became acquainted with him thereafter, in support of plaintiff’s application to tbe Veterans Administration for disability benefits, were submitted to tbe Air Force Board for Correction of Military Eecords in support of plaintiff’s application of December 12, 1958. The following partial quotes from these statements and facts based thereon are considered particularly relevant:
(a) A statement dated October 20, 1958, and signed by Major G. E. Neuburg, Loma Linda, California, reads in pertinent part:
I first met Lt. Col. Hoffman on the 25th of September 1950 in Guam, M.I. * * * I was in daily contact with Col. Hoffman during the ensuing-five weeks. During this period he appeared to me to be in good health. He was extremely energetic and active * * *.
I did not see Col. Hoffman between the end of October 1950 and the early part of April 1951. When I did see him, in Guam, in April 1951 I could hardly believe it was the same man with whom I had traveled six months previously. My first thought, upon seeing him when he alighted from the plane, was that he was absolutely ashen in appearance and that he must not be well. This definitely proved to be the case! The colonel became extremely sick in the visiting officers quarters. I called the Medical Officer of the Day, who made a trip to the Visiting Officers Quarters to determine exactly what the trouble was. He took one look at Col. Hoffman and said the Col. must be taken immediately to the Naval Hospital 15 miles down the island.
_ At this point the Col was gasping for air, was flat on his back, unable to move, and was covered with large red welts, the size of a silver dollar. His face, arms and legs became greatly enlarged, almost as we watched him. We were unable to get his shoes on his feet and were not able *484 to remove bis masonic ring from his finger. The finger swelled to such size that when we got the Col to the hospital the ring had to be cut off. When I say we, I mean Lt Wm. T. Kuhlman, a friend of mine and myself. An ambulance was not immediately available so the motor pool sent over a staff car. Lt Kuhlman and I carried Col Hoffman out to the car and held him on our laps in the back seat while the driver raced, at high speed, down the island to the Naval Hospital. * * * On the way to the hospital, the Col appeared to have a convulsion and Lt. Kuhlman and I thought he was dying. I tried to open his mouth to keep him from swallowing his tongue, but was not able to keep ahold of the tongue because of the bumping of the car and Col Hoffman’s threshing aromid. It was a wild and terrible ride! Upon arrival at the Naval Hospital, he was immediately given adrenalin.
I visited Col Hoffman at the hospital daily. He was there about two weeks. When released from the hospital, the Col no longer had the big red spots on him, but was so weakened that he could hardly walk and was unable to carry his brief case. * * * I saw Col Hoffman several times in the months following his illness. He looked haggard and worn out and had trouble with his voice. In my opinion, subsequent to his illness, Col Hoffman was a very changed man. He no longer had the youthful bounce that had distinguished him previously.
# * * ❖ *
(b) In a statement dated September 29, 1958, Albert A. Rhine, San Francisco, California, a personal friend of the plaintiff since 1937, stated that prior to the time of plaintiff’s departure for Japan, he appeared to be in “perfect health”, but that after his return to the United States in January 1952, “he had a cough and did some wheezing”; that he visited plaintiff several times during the summer of 1953 and that frequently plaintiff became short of breath.
(c) A statement dated October 20,1958, and signed by Mrs. Alice Reed, Mesa, Arizona, a personal friend of plaintiff, reads in pertinent part:
I have known Lt. Col. Hoffman since 1943. I know personally that prior to his return to the United States from his tour of duty in Japan in 1952 that he had never suffered with any breathing defects or respiratory ailments.
*485 In February of 19521 accompanied Mr. and Mrs. Hoffman on an. automobile trip from Phoenix, Arizona to Indianapolis, Indiana. During this trip he began having difficulty with breathing which resulted in what seemed to be a severe attack of asthma. Mr. Ploffman became so desperately ill that we stopped at a Motel in order to obtain the services of a doctor. At this time he was obviously running a very high fever accompanied by severe vomiting. We were unable to obtain the services of a local doctor and his temperature reached a point that it was necessary for Mrs. Hoffman to use cold packs and other means in an attempt to control the fever.* * *.
The next day we went on to Mr. Hoffman’s sister, Mrs. Oscar Findley, at Cape Girardeau, a short distance from where we were located at the Motel. After arriving at Mrs. Findley’s a private physician was called and he indicated that Mr. Hoffman had bronchial asthma and gave him treatment for that condition. We spent three days with Mrs. Findley before Mr. Hoffman was able to continue the trip. * * *
(d) A statement dated October 15, 1958, and signed by Major Ardell L. Glantz, Vacaville, California, reads in pertinent part: .
* * * I became acquainted with Mr. Hoffman approximately two years ago, when he started to attend Deserve meetings at the Davis flight. Living in the same vicinity, we shared transportation facilities, thus I became acquainted with Mr. Hoffman, not only on a professional basis but also on a social basis. Many times during our discussions I have noted a wheezing and a shortness of breath.
Mr. Hoffman has been commander of our Deserve flight D for the past year and as such, has had to conduct meetings on many occasions. While moderator of the class, a distinct loss of voice was evident.
During this period this condition has grown more noticeable and these attacks have occurred more frequent.
(e) A statement dated October 27, 1958, and signed by Major Berl Dobinson, Vacaville, California, who, as Flight Commander of the Deserve Squadron at Davis, California, to which plaintiff was assigned, became acquainted with plaintiff in March 1957, and reads in pertinent part:
In early March 1957 Floyd L. Hoffman, Lieutenant Colonel, USAF (D) AO 480 056 joined Flight 8, 9383 *486 Air Reserve Squadron, University of California, Davis, California of whicli I was then First Commander. Early in our acquaintance, I noted a deep hoarseness in his voice. As our association continued I observed that at times his voice showed marked impairments.
Our association has continued, either professional or social for the period March 1957 to the present.
His voice impairment has continued to grow worse. Recently, the last two months, September and October 1958 the Colonel’s voice is almost constantly impaired severely, at times to the point of failure.
(f) A statement dated October 23, 1958, and signed by a neighbor, Donald J. Maher, Fairfield, California, reads in pertinent part:
I became acquainted with Mr. Floyd L. Hoffman about a week after he moved into our neighborhood in November of 1956. Soon after our meeting, Mr. Hoffman joined our neighborhood commute to work club. All the men of the Club enjoyed Mr. Hoffman’s company and at first he was a very dependable member but, after about three months Mr. Hoffman’s health began to fail to a point that when we picked him up in the morning he was so short of breath that he would have to drive himself to get into the car. In the evening when we would pick him up for the trip home he would just collapse from exhaustion and his voice could hardly be heard when he spoke. During the winter months Mr. Hoffman was off many times because of his health and after he would return to work, he looked like he should be back in bed at home. It would take Mr. Hoffman about a month to get his voice and normal vitality back after one of his attacks. * * *
jji % H* ❖ #
(g) A statement dated November 1, 1958, and signed by a neighbor, Robert L. Greenland, Fairfield, California, reads in pertinent part:
My acquaintance with Mr. Floyd L. Hoffman began in late November 1956 when he became a member of our commute to work group. From November 1956 until January 1958 I was a member of this commute group. During that time it became apparent that Mr. Hoffman’s health was a matter of concern. Some mornings when he joined us, he was experiencing great difficulty in breathing which caused comment of those in the group. *487 At various times on the completion of tbe day’s work his voice was barely audible and he seemed near a state of collapse. Mr. Hoffman considered his work more important than his health, therefore going to work many days that he should have remained in bed. His absences because of illness were of too short a duration for complete recovery; Mr. Hoffman feeling it necessary to return to his job.
❖ # #
25. (a) It appears that the Correction Board referred plaintiff’s application of December 12, 1958, requesting that his military records be changed, together with plaintiff’s military and medical records and supporting documents, to the Office of the Surgeon General for review. In a memorandum dated July 15, 1959, identified as a fourth indorsement to a previous document dated May 22, 1959, the Chief of the Physical Standards Division, Directorate of Professional Services, Office of the Surgeon General, stated as follows:
1. The basis of this request for a change in the records is. primarily the fact that there is evidence of treatment with penicillin or other medication which produced a rather severe reaction and mention in the medical records of recent allergies and asthma. The applicant was separated from the service in April 1952, and an examination dated 21 April 1952 considered him qualified for service. He obtained employment and maintained a reserve status for some time. His condition has gradually grown worse and he is now alleged to be disabled.
2. The Veterans Administration has recently denied service connection for his disability.
3. It is the opinion of the Surgeon General that the conditions which existed at the time of separation were not of sufficient severity to warrant a finding of permanent incapacity and disability retirement. No change in the record is believed indicated and none is recommended.
(b) The record does not disclose that plaintiff was given a physical examination by the Office of the Surgeon General prior to the time the above-quoted opinion was expressed. Nor does it appear that a copy of that opinion was furnished to plaintiff while his application was pending before the Correction Board.
*488 26. By memorandum dated September 24,1959, the Executive Secretary of the Air Force Board for the Correction of Military ^Records advised the Director of Administrative Services that the Board had considered plaintiff’s application and determined that no corrective action was indicated in his case. Plaintiff was not given a formal hearing before the Board, on the grounds that he had failed to submit sufficient evidence to establish a showing of “probable error or injustice.” By letter dated October 2,1959, plaintiff was advised by the Executive Secretary of the Board that it had denied his application.
27. Dr. Nesbitt (referred to in finding 21 (a) and (b), supra), testified at the trial as an expert medical witness and stated that he made a house call upon plaintiff and saw him for the first time on March 23,1957. He stated that plaintiff was suffering from a severe asthmatic attack on that occasion; that he was then totally incapacitated; and that he was disabled for several days. About a month later, Dr. Nesbitt saw plaintiff because of “tiredness and wheezing in his chest” which was attributed to plaintiff’s asthmatic condition.
Dr. Nesbitt treated plaintiff a number of times in October and November 1958 for influenza, “with chills and sore throat.” In February 1959, Dr. Nesbitt again treated plaintiff for an asthmatic attack and this was the first time he had done so following plaintiff’s attack in March of 1957.
Plaintiff was seen by Dr. Nesbitt’s associate for “asthma emphysema” on August 7, 1959. He saw plaintiff twice in May 1960, at which times he was suffering from a respiratory allergy and his eyes, nose and sinuses were inflamed. According to Dr. Nesbitt, asthma and upper respiratory allergies are very closely related and at times merge with one another. Plaintiff was seen on October 13 and 31, 1960, for sinusitis and asthma; and his asthma condition had subsided considerably by the time of the second visit. Dr. Nesbitt’s associate saw plaintiff on November 26, 1961, for another respiratory infection; on February 4 and 5,1962, because of shortness of breath at which time plaintiff’s condition was diagnosed as asthma; in April 1962, when notations were made with respect to plaintiff having a “barrel chest and asthmatic wheezes *489 or swells throughout his chest;” and on October 7, 1962, by which time plaintiff’s condition showed some improvement. On July 16,1962, plaintiff was given an antibiotic treatment for “early acute bronchitis”. He was given a chest check again in August 1962 by Dr. Nesbitt who found some wheezing but “it sounded quite good at that time, considering the way it sounded in the past.” In September and October of 1962, plaintiff was given some influenza shots. Dr. Nesbitt last saw plaintiff on January 12, 1963, at which time he was treated for “cracking on the corners of his mouth.”
Dr. Nesbitt testified that on the basis of his findings and plaintiff’s history, his diagnosis of plaintiff’s condition was that he had “intrinsic asthma which was progressive to the point where he developed emphysema.”
Dr. Nesbitt stated that in his view the asthma attack experienced by plaintiff in 1951 was precipitated by the penicillin injections given to him at that time; that plaintiff’s intrinsic asthma evidenced itself following repeated respiratory infections and said penicillin reaction; that the symptoms later appearing during the period he treated plaintiff were substantially the same as those that occurred in 1951, and were “classic examples of manifestations of intrinsic asthma”; that intrinsic asthma is a permanent condition that is usually slowly progressive and causes organic changes which result in emphysema; and that in plaintiff’s case his intrinsic asthma progressed to the point that he developed emphysema. Dr. Nesbitt stated that emphysema is a very slow developing malady that often follows repeated attacks of asthma; and he described this disease as a “structural change in the chest which results from obstructed breathing, causing the development of a barrel chest * * * increased resonance to percussion, and shortness of breath, because the lungs are expanded to the point where you don’t have the inflow and outflow of air that the normal person has.” Dr. Nesbitt stated that emphysema is a progressive and incurable disease. Dr. Nesbitt also stated that it would be difficult to establish the time when plaintiff’s bronchial asthma progressed to the stage that it developed into emphysema, but that such condition would have become well advanced before it was physically obvious.
*490 Dr. Nesbitt, who has served as a medical member of Naval Boards of Medical Survey, expressed the opinion that plaintiff was physically unfit for full military duty at the time of his release from active military service in April 1952; that there was sufficient evidence available at that time by way of history furnished by plaintiff and official documentary medical history to have enabled him to find that plaintiff was disabled in 1952; and that while, in his opinion, plaintiff’s emphysema condition was not advanced in April 1952 to the stage that it would have been disqualifying at that time, his asthma condition in 1952 was such that he was then disqualified physically from performing full active military service.
28. Dr. Dougan, (referred to in findings 19 and 20, supra), a specialist in diseases of the chest, testified at the trial as an expert witness. He stated that he first examined plaintiff on December 12, 1957, at which time the history obtained from plaintiff showed that he had asthma dating back to an experience of anaphylactic reaction to injections of penicillin in April 1951. Dr. Dougan described plaintiff as a constitutionally allergic person whose first violent manifestations was his reaction to the penicillin injections which resulted in a near fatal attack; and he stated that once an individual experiences such a severe allergic reaction, it is easier to react to asthma in the future. He stated that the penicillin reaction suffered by plaintiff in 1951 “opened the door wider and lowered the threshold so that it is much more easy now for bim to be tipped into an attack than he would before”; that plaintiff has suffered allergic attacks since 1951, but that none of them has been as devastating as the first one; and that the attacks that occurred subsequent to the one in 1951 were precipitated by chronic pulmonary infection, described as “chronic bronchitis”.
Dr. Dougan diagnosed plaintiff’s condition as bronchial asthma, chronic bronchitis, and emphysema which Dr. Dou-gan described as a condition in which sacs in the lungs have been “cut off from the airways and they act as dead spaces, thereby impairing the efficiency of the chest.” Dr. Dougan testified that plaintiff’s bronchitis and emphysema are progressive conditions.
*491 29. Section 207 of tbe Legislative Reorganization Act of 1946, as amended by Public Law 220, 82d Congress, 1st Session, (10 U.S.C. 1552,65 Stat. 655), is the statute under which the Air Force Board for Correction of Military Records was established, implementing departmental regulations governing the Board’s procedures were established, and the criteria for relief was identified. Section 1552(a) of that statute reads in pertinent part:
The Secretary of a military department, under procedures established by him and approved by the Secretary of Defense, and acting through boards of civilians of the executive part of that military department, may correct any military record of that department when he considers it necessary to correct an error or remove an injustice. * * *
Pursuant to the above-quoted statutory authority, the Secretary of the Air Force issued Air Force Regulation 31-3, dated November 3, 1952, which sets forth procedures relating to the Correction Board, and provides, inter alia, that an application for correction may be denied by the Board, if it determines that a sufficient basis for review has not been established; but if such a basis for review is indicated, then Paragraph 11 of that regulation is applicable. Paragraph 11 reads in pertinent part:
When an application has been found to be within the jurisdiction of the Board and sufficient evidence has been presented indicating probable error or injustice, the applicant will be entitled to a hearing before the Board either in person or by counsel of his own selection or in person with counsel.
30. The provisions of the pertinent sections of the Veterans Administration Schedule for Rating Disabilities, specifically those under Diagnostic Code Numbers 6600 or 6602, provide as follows:
6600 Bronchitis, chronic:
Severe; with dyspnea at rest of on slight exertion and considerable emphysema_ 60
Moderately severe; persistent cough at intervals throughout the day, considerable expectoration, considerable dyspnea on exercise, rales throughout chest, beginning emphysema_:_ 30
*492 Moderate; considerable night or morning cough; slight dyspnea on exercise, scattered bilateral rales-o 1-1
Mild; slight cough, no dyspnea, few rales_ o
* * * *
6602 Asthma, bronchial:
Pronounced; marked emphysema, attacks very frequent, dyspnea on slight exertion, between attacks, marked loss of weight or other evidence of severe impairment of general health_ 100
Severe; moderate emphysema, frequent attacks (one or more weekly), marked dyspnea on exertion between attacks, impairment in general health manifested by malnutrition, etc_ 60
Moderate; slight to moderate emphysema, attacks rather frequent (10-14 day intervals), moderate dyspnea on exertion between attacks- 30 Mild; without emphysema, and occurring at widely spaced intervals- 10
Emphysema
No separate rating; covered by basic condition.
Ultimate FINDINGS
31. (a) At the time plaintiff was given a physical examination on April 21,1952, for the purpose of separation from the Air Force, he was suffering from intrinsic bronchial asthma which is a permanent condition, but not a consistent one, in that it is characterized by “ups and downs”, i.e., pe- ' riods of remission and exacerbation. Apparently plaintiff’s condition was in a state of remission at the time of that examination.
(b) During the course of plaintiff’s examination on April 21,1952, he furnished a history of having suffered an episode of asthmatic bronchitis in Tokyo during 1950 and 1951, and being given penicillin therapy in April 1951, which resulted in a severe penicillin sensitivity reaction. Despite that history, it should be noted and kept in mind that the record in this case does not disclose that official medical records and reports relating to illnesses suffered by, and treatments afforded, plaintiff during 1950 and 1951, while he was on active duty in Japan, particularly the attack that occurred on Guam in April 1951, were available to the medical officer and authorities who examined and approved plaintiff for separation, or that plaintiff advised the examining medical officer or authority of the attack he suffered in late February 1952, while *493 enroute to Wriglit-Patterson AFB, Dayton, Ohio, (see finding 6, supra) ; that plaintiff admittedly did not realize the seriousness of his condition at the time of his separation examination and did not become aware of his true condition until about 1954; and that plaintiff’s bronchial asthma condition apparently was in a state of remission when he was examined for the purpose of separation. Considering the foregoing facts, it cannot be affirmatively found, the testimony of Dr. Nesbitt to the contrary nothwithstanding (see finding 27, supra), that there was sufficient evidence, by way of history furnished by plaintiff and official documentary medical history, available at the time of plaintiff’s separation examination to justify a determination by military medical authorities that plaintiff then was physically unfit to perform full military duties. Nor can it be found that Air Force medical authorities were remiss in their responsibilities, or wrong in their medical judgment, because they did not give a more thorough physical examination or insist that plaintiff appear before a physical evaluation board prior to his being separated from active duty with the Air Force; and any finding to the effect that if plaintiff had appeared before such a board prior to his separation, it would have determined that he was then physically unfit to perform the duties commensurate with his office, grade or rank, would be of a highly speculative nature and unsupported by the record.
(c) The record does not support the opinion expressed by Dr. Nesbitt, mentioned, supra, to the effect that there was a sufficient record in 1952, by way of history from the plaintiff and documentary medical history, to have enabled him to reach the decision that plaintiff was physically disabled and unfit for full military duty at the time of his separation from active duty with the Air Force on April 29, 1952, because of bronchial asthma. It is quite clear from Dr. Nesbitt’s testimony that he made a retrospective diagnosis of plaintiff’s condition at the time of his separation based upon medical history furnished by plaintiff relating to periods prior and subsequent to his separation, reports of some of the physical examinations given to plaintiff and medical records covering plaintiff’s illnesses, attacks and treatments that relate to pe *494 riods subsequent to Ms separation which were not before medical authorities who examined plaintiff on April 21,1952, and Dr. Nesbitt’s knowledge of plaintiff’s condition gained through medical examinations and treatments afforded plaintiff by Dr. Nesbitt, or his associate, during the period from March 1957 to January 1963.
32. The unrebutted evidence of record clearly shows that plaintiff’s history of respiratory infections and illnesses dates back to about December 1950; that during the period between December 1950 or January 1951, and April 1951, while he was in Tokyo, Japan, plaintiff was given a series of penicillin injections, as well as other medications and treatment, for his respiratory infections and illnesses; that in April 1951, while on Guam, plaintiff violently reacted to penicillin injections given to him in Japan, which precipitated an asthma attack and triggered an intrinsic asthma condition that progressed from that date forward to the point he developed bronchial asthma, chronic bronchitis, and emphysema, a progressive, disabling and incurable disease; that from April 1951 until plaintiff was given a physical examination on April 21, 1952, for the purpose of separation from the Air Force, his bronchial ailments developed so slowly that they were not physically obvious at the time of said examination; that considering the fact that plaintiff’s bronchial asthma condition was in a state of remission at the time of his separation, it is extremely doubtful that a more thorough examination would have established that he was physically disqualified for full military duties at that time as a result of his bronchial asthma condition or that a physical evaluation board would have made such a determination; that plaintiff’s bronchial asthma and physical condition did not become sufficiently serious to be physically obvious and disabling until 1954, when, as a result of an examination made of plaintiff by military medical officers, it was determined that he was not fit for “general military service”; that from 1954 forward, plaintiff’s bronchial asthma condition progressed more rapidly than it had in prior years; and that he is now permanently disabled with bronchial asthma, chronic bronchitis and emphysema.
*495 33. (a) It is concluded that there was a direct causal connection between the respiratory illnesses and “episode of asthmatic bronchitis” suffered by plaintiff in 1950 and 1951, while he was on active duty in Japan, including the adverse reaction he had to penicillin injections given to him in Japan which resulted in the attack that occurred on Guam in April 1951, and plaintiff’s present physical condition. Plaintiff did not have any record of serious respiratory disturbance upon entering on active duty in 1948, and it cannot be seriously questioned that his disability is service-connected.
(b) Although the foregoing conclusions are contrary to the determination made by the Veterans Administration that plaintiff’s bronchial asthma was not service-connected (see finding 22(a), supra), it should be pointed out that all of the evidence of record in this action was not available to the Veterans Administration at the time such determination was made. In any event, regardless of the above, it also should be kept in mind that the controlling question for determination in this case is not whether the decision of the Veterans Administration was proper, nor whether plaintiff is now physically disabled from discharging full military duties, but rather whether his physical condition was such at the time he was separated from the Air Force that he was then unfit to perform the duties of his grade or rank because of a service-connected disability. On the basis of the entire record, the latter question must be answered in the negative.
34. It would appear that the medical and other supporting evidence submitted to the Air Force Board for Correction of Military Eecords was of such a substantial nature that the Board might well have held a formal hearing before reaching a decision with respect to plaintiff’s application requesting that his military records be changed. But the question of holding a hearing was a matter properly within the discretionary judgment of the Board upon which reasonable minds might differ; and the record in this case will not support a finding that the Board’s administrative decision not to hold a hearing clearly constituted an abuse of discretion.
35. On the basis of the evidence submitted to the Secretary of the Air Force at the time of plaintiff’s release from *496 active duty on April 29,1952, the evidence submitted to the Air Force Board for Correction of Military Records, and the evidence of record as a whole, it cannot be found that either the action of the Secretary of the Air Force in releasing plaintiff from active duty “not by reason of physical disability,” or the decision of the Correction Board not to hold a formal hearing for the purpose of giving plaintiff an opportunity to try to establish his disability, or the action of the Board in refusing to change plaintiff’s military records to reflect that he was retired because of a service-connected disability, was arbitrary, capricious or not supported by substantial evidence.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.

 From 1952-1958 plaintiff was employed as a Civil Service employee by the Federal Government.

 The applicable Air Force Regulations provided for a hearing only in the event the petitioner presented evidence indicating probable injustice or error. (32 CFR 881.4(a) (1954 ed.))

 Subsequent to the trial and closing of proof In this case, both plaintiff and defendant incorporated information in certain findings respectively proposed by them to the effect that on June SO, 1963, plaintiff resigned from the Air Force Reserves, having accumulated sufficient time on active and Inactive duty to be eligible for retirement benefits under the provisions of 10 U.S.C. § 1331 (Title III Public Law 810). Section 1331 grants a person the right to retired pay subject to certain age and service requirements set forth therein. Section 1401 sets forth a table showing the manner in which the amount of compensation to which a person is entitled is computed.

 The record does not disclose that the letter which Dr. Francis L. Chamberlain directed to Dr. Dougan under date of January 18, 1958, quoted in pertinent part in finding 19, supra, was submitted to the Correction Board.